# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HAROLD NUDLEMAN,** | : | **No. 3:05cv1362** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **BOROUGH OF DICKSON CITY** | : | |
| **POLICE DEPARTMENT,** | : | |
| **WILLIAM A. STADNISKI, PHILIP F.** | : | |
| **DAVITT, and THOMAS** | : | |
| **LOGAN,** | : | |
| **Defendants** | : | |

## MEMORANDUM

_____Before the court is defendants' motion for summary judgment (Doc. 25).

Having been fully briefed, the matter is ripe for disposition.

## Background

This case grows out of a disagreement between the plaintiff and Dickson City,

Pennsylvania police officers on November 26, 2004.  On that date, Defendant Philip

Davitt, a Dickson City Police Officer, pulled over a Millenium Packing Services, Inc.

("Millenium") truck for a taillight violation.  (Defendants' Statement of Material Facts

(Doc. 26) (hereinafter "Defendants' statement") at ¶ 1; Plaintiff's Answer and

Counter-Statement of Facts in Opposition to Defendants' Statement of Material

Facts (Doc. 30) (hereinafter "Plaintiff's statement" at ¶ 1).[1]  Officer Davitt did not

_____

[1]We take these statements from Defendants' Statement of Material Facts, noting
where plaintiff disputes those facts.  We note that Local Rule 56.1 requires both parties to

know that the truck was owned by Millennium when he stopped it.  (Defendants'

statement at ¶ 2).  The parties agree that the taillights were not working properly.

(Id. at ¶ 3).  Darryl Sobol, the truck's driver, was later convicted of operating a motor

vehicle without working taillights.  (Id. at ¶ 4).  He paid the fine associated with the

offense.  (Id.).

After Officer Davitt stopped Sobol, he requested that he be allowed to exit the

vehicle to check the taillight and attempt to repair it.  (Id. at ¶ 5).  Officer Davitt

permitted Sobol to do so.  (Id.).  Meanwhile, Officer Davitt used his police radio to

report the traffic stop.  (Id. at ¶ 6).  Fellow Dickson City Police Officer Thomas Logan

soon arrived to offer assistance.  (Id.).  Officer John Sobieski also arrived on the

scene, but left after determining that Logan and Davitt were in control.  (Id. at ¶ 7).

Officer Davitt testified that he contacted the Pennsylvania State Police to request

that a member of the Truck Inspection Unit with expertise in trucking regulations

inspect the truck.  (Id. at ¶ 8).  No officer was available, though Officer Davitt testified

---

submit such a statement using numbered paragraphs, with the non-moving party
"responding to the numbered paragraphs set forth in the statement required in the
foregoing paragraph, as to which it is contended that there exists a genuine issue to be
tried."  The rule also requires that '[s]tatements of material facts in support of, or in
opposition to, a motion shall include references to the parts of the record that support the
statements."  L.R. 56.1.  Here, the defendants, the moving party, submitted such a
statement.  Rather than replying to that statement as directed by the rules, plaintiff
submitted his own statement of material facts with (minimal) references to the record.
Defendants then submitted their own reply to that statement of facts, with references to the
record.  (Doc. 31).  While we have managed to address the motion despite these
deficiencies in filing, we would remind the plaintiff to observe in the future the requirements
of the local rules as the points of contention between the parties become clearer under that
system.

that the trooper who answered his call informed him that he should not allow the truck on the interstate highway with a malfunctioning taillight.  (Id.).

After Sobol's repairs to the taillight proved unsuccessful, he phoned a Milleunnium supervisor for assistance with the light.  (Id. at ¶ 9).  Dean Sposto, plaintiff's supervisor, called Plaintiff and ordered him to travel to the traffic stop to make the necessary repairs.  (Id. at ¶ 10).  Plaintiff is a  former Dickson City Police Officer who filed a wrongful termination, discrimination and retaliation suit against Dickson City and its police department.  (Id. at ¶ 11).  He also had a pending worker's compensation claim against the Borough on the date in question.  (Id.).  Soon after receiving the call from Sposto, plaintiff arrived at the "busy public parking lot" of a local grocery store, scene of the stop.  (Id. at ¶ 12).  Plaintiff, who did not have training as a mechanic, had not before been sent to the field to fix a Millennium truck.  (Id. at ¶ 13).[2]

The parties disagree about the events that occurred after plaintiff arrived at the scene.  Not in dispute, however, is the fact that the officers eventually took plaintiff into custody, issued him a citation for disorderly conduct, and then released him.[3]  At some point during the incident, one or more of the officers spoke by cell phone with

---

[2]Plaintiff denies this statement in his answer to defendants' statement of facts, but does not explain the basis for this denial or cite to those portions of the record that support his contention.

[3]As the facts related to these events are central to the disposition of the motions for summary judgment in this case, we will provide those facts in more detail when we discuss the motions below.

Defendant Stadniski, who is the Borough's Chief of Police.  A magistrate judge

eventually dismissed the charges against the plaintiff.

On July 6, 2005, plaintiff filed the instant complaint against the Police

Department of the Borough of Dickson City, Chief Stadniski and Officers Davitt and

Logan.  (See Complaint (hereinafter "Complt.") (Doc. 1)).   Count I of the complaint

alleges that defendants retaliated against plaintiff for exercising his free speech right

in a lawsuit against the Police Department and other Dickson City defendants.

Count II contends that defendants violated plaintiff's Fourteenth Amendment Due

Process rights by unlawfully depriving him of his liberty and reputation.  Count III

alleges that plaintiffs conspired to act under color of state law to deprive plaintiff of

his rights under the First, Fourth and Fourteenth Amendments.  Count IV charges

that defendants had arrested plaintiff falsely and violated his rights under federal law.

Count V contends that this false arrest also violated plaintiff's rights under state law.

Count VI alleges malicious prosecution which violated plaintiff's federal rights, and

Count VII insists that such prosecution violated his rights under Pennsylvania law.

Count VIII is a state law claim of assault and battery against defendants Davitt and

Logan.  Count IX claims false imprisonment, Count X intentional infliction of

emotional distress, Count XI "supervisor" liability for Defendant Stadniski and Count

XII defamation.

Defendants filed a motion to dismiss the complaint (Doc. 8).  After briefing this

court issued a memorandum and order denying the motion in part and granting it in

4

part.  (Doc. 14).  The courts decision dismissed counts II, VI and XII.  After discovery, the defendants filed a motion for summary judgment (Doc. 25).  Both sides briefed the issue, bringing the case to its present posture.

**Jurisdiction**

As this case is brought pursuant to 42 U.S.C. §§ 1983 and 1985, we  have jurisdiction  under 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  We  have supplemental jurisdiction over the plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

**Legal Standard**

Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion.  Int'l Raw

5

Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The

burden is on the moving party to demonstrate that the evidence is such that a

reasonable jury could not return a verdict for the non-moving party.  Anderson, 477

U.S. at 248 (1986).  A fact is material when it might affect the outcome of the suit

under the governing law.  Id.  Where the non-moving party will bear the burden of

proof at trial, the party moving for summary judgment may meet its burden by

showing that the evidentiary materials of record, if reduced to admissible evidence,

would be insufficient to carry the non-movant's burden of proof at trial.  Celotex v.

Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the

burden shifts to the nonmoving party, who must go beyond its pleadings, and

designate specific facts by the use of affidavits, depositions, admissions, or answers

to interrogatories showing that there is a genuine issue for trial.  Id. at 324.

**Discussion**

Defendants move for summary judgment on several grounds.  We will address

each of those grounds in turn.

**A.  Claims Against the Borough of Dickson City and the Dickson City Police
Department**

Defendants claim that the Borough and the Police Department cannot be

liable to Count III of the plaintiff's complaint, which alleged that the defendants

violated plaintiff's rights "pursuant to official policy, custom and practice of the

Defendant, Police Department."  (Complt. at ¶ 50).  They argue that plaintiff has

6

produced no evidence to demonstrate that the Borough had a policy, custom or practice that led officers to issue false or baseless citations as a form of retaliation. Defendants also contend that no evidence demonstrates that training for such officers was inadequate.

In order to prevail on Section 1983 claim against an entity like Dickson City, "a plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." Board of the County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 403 (1997). Liability attaches either to an official policy or to a "custom" that constitutes a "practice . . . so widespread as to have the force of law." Id. at 404.   A particular decision, like a decision to fire an employee, can give rise to municipal liability under Section 1983.  A  "'[p]olicy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy or edict.'" Berg v. County of Allegheny, 219 F.3d 261, 275 (3d Cir. 2000) (quoting Kneipp v. Tedder, 95 F.3d 1199, 1212 (3d Cir. 1996) (internal quotation marks omitted)).   In cases that involve the decision of an individual, the key question is whether that individual was a policymaker, which is "a question of state law." McGreevy v. Stroup, 413 F.3d 359, 367 (3d Cir. 2005).

Plaintiff contends that he has established municipal liability by showing that the decision to issue him a citation and take him into custody was one made by Defendant Stadniski, the Chief of Police for the Borough.  He also argues that the

7

policies that led to his arrest were established by the Chief, a policymaker, and thus represent official Borough policy.

At his deposition, Defendant Stadniski addressed his policymaking role in the Borough.  He agreed with a statement that ascribed to him "a demonstrated history of forumlating policy as evidenced by his issuing of general directives on subjects such as Police complaints, of overall personnel administration responsibility, as evidenced by his effective involvement in suspensions and discharges, budget making, and in purchasing."  (Deposition of William Stadniski, attached as Exhibit 2 to Plaintiff's Answer to Defendants' Statement of Facts (Doc. 30) (hereinafter "Stadniski Dep.")  at 21).  He also affirmed that his role as chief included work on "policy, personnel . . . [and] administrative decisions."  (Id.).

Defendant Stadniski also testified that he had been telephoned by Officer Logan on the night of plaintiff's arrest.  Logan told Stadniski that police had stopped a Millenium truck and that plaintiff had arrived on the scene.  (Id. at 61-62).  Plaintiff testified that Logan told him that Nudelman had been "acting like an idiot."  (Id. at 62).  According to the Chief, he told Logan that he should "treat [plaintiff] like you'd treat anybody else."  (Id.).  He ordered the officer to contact him when he finished with the call.  (Id.).  During his deposition, dispute appeared over how many times Stadniski spoke with Officers Logan and Davitt on that evening.  (Id. at 79).  While telephone records seemed to indicate that the Chief had spoken with the officers as many as eight times that evening, Stadniski insisted that only two of those calls

8

concerned the traffic stop and the plaintiff.  (Id.).

A reasonable juror could conclude from this evidence that Chief Stadniski was a policymaker for the Borough.  Such a juror could also view evidence that established that Stadniski was in close and frequent contact with Officers Logan and Davitt both before and after they issued plaintiff a citation on November 24, 2004–an action not usual for a rather routine traffic stop–and conclude that Chief Stadniski made the decision to charge plaintiff with disorderly conduct.  As a decision from a policymaker, Stadniski's action could be interpreted as an official policy of the Borough.  As such, we will deny the Borough's motion for summary judgment on the issue of the existence of an official policy or custom that violated plaintiff's rights.

Plaintiff also raises a failure-to-train claim against the municipality.  The Supreme Court has held that "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."  City of Canton v. Harris, 489 U.S. 378, 389 (1989).  Further, "[w]hen a plaintiff alleges that a municipality has not directly inflicted an injury, but has caused an employee to do so, stringent standards of culpability and causation must be applied to ensure that the municipality in a § 1983 suit is not held liable solely for the conduct of its employee."  Reitz v. County of Bucks, 125 F.3d 139, 145 (3d Cir. 1997).  These strict standards exist because "in enacting § 1983, Congress did not intend to impose liability on a municipality unless *deliberate*

9

action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." Brown, 520 U.S. 397, 399 (1997).  Therefore, "deficient training may form a basis for municipal liability under section 1983 only if 'both (1) contemporaneous knowledge fo the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate' are present." Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 (3d Cir. 1997) (quoting Freedman v. City of Allentown, 853 F.2d 1111, 1117 (3d Cir. 1988)).

As evidence of insufficient training, plaintiff points to a memorandum authored by Chief Stadniski on May 13, 2004.  (Doc. 28 at 5).  This memorandum required that all complaints made by or against any appointed or elected official be investigated, memorialized in a report and sent to the Chief for review.  (Id.).  The Chief would then forward the complaint to the District Attorney's Office.  (Id.).  No charges would be filed against any officer unless reviewed and approved by the Chief and the District Attorney.  (Id.).  Stadniski testified that he adopted this policy because he thought members of the Borough Council had begun to abuse their offices and bring charges against individual officers as a means of damaging political opponents.  (Id.) (See Stadniski Dep. at 15).  The policy appeared in part, plaintiff contends, because of a series of lawsuits filed against the Borough and the Police Department.  (Id.).  This policy did not apply, however, to other complaints where the

10

plaintiffs alleged that they had been unfairly targeted.  (Id. at 99).

Stadniski testified at his deposition that he had never ordered his officers to target anyone for arrests, and that he did "not allow them to do that, nor would I instruct them to do that, or would I tolerate them to do that."  (Id. at 92).  He had been aware of several complaints filed by plaintiff against the Borough and the Police Department, and that he had signed a certificate of service on a 2004 lawsuit. (Id. at 36-37).  He claimed, however, that "I don't read this stuff when it comes in from him," because the Chief considered it "nonsensical."  (Id. at 38).  At some point after attorneys entered their appearance in that case, however, they explained the allegations contained in it to him.  (Id. at 42).

Defendant Stadniski also testified that he was aware of complaints alleging civil rights violations against several police officers, including himself and Officer Davitt.  (Id. at 43).  He again claimed, however, that he did not know what allegations those complaints contained.  (Id. at 44).  Defendant admitted, however, that he was aware of allegations filed in a complaint by plaintiff's employer of "selective targeting of traffic stops against Millenium employees and business invitees as a pattern of harassment and intimidation."  Id. at 59.  He was not aware, however, of any specific complaints of harassment relating to issuing citations against Officer Davitt or Logan. (Id. at 85-86).

In light of the allegations against the Police Department, Chief Stadniski began "testing . . . an in car camera system that both voice records and video records traffic

11

stops." (Id. at 97).  He took this action because "[t]hose allegations are false, [and]

nothing has to be corrected." (Id.).  The cameras were to ensure that "we would

have our ass covered against false allegations like this that if the camera was rolling

at the time and the conversations were being recorded there would be no reason to

even be here because then we would prove that nothing was going on that they were

out and out lies." (Id.).  Beyond assisting in the defense of lawsuits, such cameras

would "monitor if an Officer behaves." (Id. at 98).  Though Officers who violated a

suspect's rights could face "excessive force cases," the Chief added the cameras in

part for that purpose. (Id.).

        We find that a reasonable juror could conclude that the Borough was aware of

numerous allegations of misconduct by police officers during traffic stops.  Chief

Stadniski testified that he had received complaints about alleged targeting of

Millenium trucks by the Borough, as well as other complaints of police misconduct.

A juror could reasonably find less-than-credible the Chief's claims that he was

unaware of the contents of such suits, since the Chief had accepted service of the

complaints.  Chief Stadniski also testified that he was aware of alleged favoritism in

enforcement in the Borough.  A reasonable juror could also find that the Chief's

actions in this case communicated a message of approval for the offending actions.

While the department established policies to prevent improper influence from non-

police officers in bringing charges, a jury could conclude that the department did

nothing to train officers themselves on how to avoid bringing charges motivated by

political interest and which violated constitutional rights.  This lack of training, when coupled with a specific policy aimed at those outside the department, could be viewed by jurors as tacit approval of the conduct.  Similarly, a jury could conclude that the installation of cameras in police cars, whatever effect they had on limiting abusive police tactics, was not a form of training, but an effort at surveillance. Accordingly, we find that plaintiff's failure-to-train claim survives summary judgment. We will deny defendants' motion on this point.

### B.  Conspiracy Claims

Defendants argue that they should be granted summary judgment on plaintiff's conspiracy claims, brought pursuant to 42 U.S.C. § 1985(3).  They contend that plaintiff has not demonstrated that two or more individuals acted together to bring about a conspiracy, but instead has only shown that a group of individuals engaged in a collective decision.  Since those individuals work for a single government unit, they cannot be part of a conspiracy.  In any case, defendants contend, plaintiff has not produced evidence to show that a class-based animus motivated the conspiracy. As such, defendants argue that plaintiff's claim must fail on this count.

Plaintiff responds by stating that "Plaintiff does not oppose any claim based upon Section 1985(3)."  (Plaintiff's Brief in Opposition to Motion for Summary Judgment (hereinafter "Plaintiff's Brief") (Doc. 28) at 4).  We take this statement to be an admission that this claim cannot survive summary judgment.  Accordingly, we will grant the motion for summary judgment on this claim.

13

**C. Individual Defendants**

**i. Intentional Infliction of Emotional Distress**

Defendants contend that plaintiff's claims of intentional infliction of emotional distress in Count X of his complaint fail as a matter of law.  They insist that such claims are not recognized under Pennsylvania law.  Even if they were, defendants insist, plaintiff has produced no evidence that would convince a jury that defendants have committed such a tort.

The Pennsylvania Supreme Court has stated that "we have never expressly recognized a cause of action for intentional infliction of emotional distress." Taylor v. Albert Einstein Med. Ctr., 754 A.2d 650, 652 (Pa. 2000).  Still, courts in this circuit "have repeatedly held that Pennsylvania [law] does recognize the tort." Weinstein v. Bullick, 827 F.Supp. 1193, 1203 (E.D. Pa. 1993); see also Silver v. Mandel, 894 F.2d 598, 606 (3d Cir. 1990) (predicting that "Pennsylvania's highest court will ultimately embrace" the tort of intentional infliction of emotional distress); Pavlik v. Lane Limited/Tobacco Exporters Int'l, 135 F.3d 876, 890 (3d Cir. 1998).  Thus, although the Pennsylvania Supreme Court has not "formally adopted [the] section of the Restatement" describing the tort, it has "cited the section as setting form the minimum elements necessary to sustain such a cause of action." Taylor, 754 A.2d at 652.   Accordingly, we find that courts in Pennsylvania allow the tort of intentional infliction of emotional distress, and will reject defendants' motion for summary judgment on that ground.

14

Instead, we will determine whether plaintiff has produced enough evidence to survive summary judgment. "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Id. Such tortious conduct "'must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" Hoy v. Angelone, 720 A.2d 745, 753 (Pa. 1998) (quoting Buczek v. First National Bank of Mifflintown, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)). Under this standard, "[i]t has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." Daughen v. Fox, 539 A.2d 858, 861 (Pa. Super. Ct. 1988) (quoting RESTATEMENT OF TORTS (2d) § 46 Comment (d)).

Plaintiff testified that he had suffered emotional pain and suffering as a result of the Police Department's actions. (Deposition of Harold Nudleman, attached as Exhibit 7 to Plaintiff's Answer to Defendants' Statement of Facts (Doc. 30) (hereinafter "Nudelman Dep.") at 124). He did not receive any medical treatment for that condition, however. (Id.). Plaintiff did not talk to any licensed counselor or psychologist, but instead simply tried to "[talk] it through with people." (Id.). Plaintiff

15

also testified that "[i]t just frosts me to no end that I work with these guys that they're playing this game, that they would tarnish the badge that I wore proudly."  (Id.). Anger at the situation did not cause him to need psychological help, but it "bother[ed] him" and caused "friction" with his wife and at work.  (Id. at 125).  We find that no reasonable juror could conclude that plaintiff suffered severe emotional distress from this evidence.  Though plaintiff testified that the officers' treatment angered him and caused friction at home and work, he admitted that the emotional distress he suffered did not cause him to seek professional help or lead to a breakdown in his ability to interact with others. Pennsylvania courts have held that "it is unwise and unnecessary to permit recovery to be predicated on an inference based on the defendant's 'outrageousness' without expert medical confirmation that the plaintiff suffered the claimed distress."  Kazatsky v. King David Memorial Park, Inc., 527 A.2d 988, 995 (Pa. 1987).   Accordingly, "existence of the alleged emotional distress must be supported by competent medical evidence."  Id.   Since plaintiff provides no such evidence, we will grant summary judgment to all of the defendants on this claim.

### ii.  Officer Logan

Defendants also seek summary judgment for plaintiff's claims of false arrest, malicious prosecution and retaliation against Officer Logan.  They contend that probable cause existed for him to take action against the plaintiff.  Defendants also argue that plaintiff's state law battery claim against Officer Logan cannot survive

summary judgment.  Because Officer Logan made a lawful arrest, defendants argue, he cannot be liable for battery.  Even if Officer Logan could be liable for such claims, however, defendants insist he would be entitled to qualified immunity for such actions.

Officer Logan testified that when he arrived at the scene of the traffic stop he encountered Sobel, the truck's driver, and Officer Davitt.  (Deposition of Officer Thomas Logan, Attached as Exhibit 4 to Plaintiff's Answer to Defendants' Statement of Facts (Doc. 30) (hereinafter "Logan Dep.") at 28-29).  At that point, Officer Davitt was in his police car, filling out a citation.  (Id. at 29).  Officer Logan engaged Sobel, whom he had known for years, in conversation.  (Id.).  Shortly thereafter, plaintiff arrived on the scene.  (Id.).  According to Logan, plaintiff immediately behaved in an aggressive fashion, demanding to know "who [was] in charge of this clusterfuck." (Id.).  Logan tried to calm the plaintiff, telling him that "[t]here's tail lights out in the truck that's all it is.  Don't make a big deal out of it."  (Id.).  Plaintiff, Logan claims, "kept huffing [and] puffing, waving his arms, prancing around the truck trying to get it fixed."  (Id.).  Logan told the plaintiff to calm down, and plaintiff responded by pointing his finger at the Officer, taking two steps towards him and warning him "don't mess with me."  (Id.).  He again pointed at the defendant.  (Id.).  Logan found this treatment disrespectful and inappropriate, especially from a former police officer. (Id. at 30).  He understood plaintiff's pointing his finger at him as "a threat."  (Id. at 31).  Though Officer Logan did not "fear for [his] safety" after witnessing the first of

17

these gestures, he was unsure what would happen next and "expected things to escalate." (Id. at 44).  Plaintiff's behavior made him feel "threatened, yes, to the point where the man was going to kill me, no, but I think he might hit me, yes." (Id. at 49).

Officer Logan also testified that he never took out his handcuffs in an attempt to take plaintiff under arrest. (Id. at 68).  He never made an attempt to place handcuffs on him.  (Id.).  Instead, plaintiff responded to Logan's attempt to hand him a citation by placing his arms behind his back and shouting "'Look they're arresting me.'" (Id.).  Even after these actions, Officer Logan testified, he did not place his hand on the plaintiff.  (Id.).  Logan gave plaintiff the citation, he testified, but he did not touch him at all.  (Id. at 69).

Plaintiff testified that when he arrived on the scene, he found that the tractor's taillights did not work.  (Nudelman Dep. at 74).  He did not shout or scream, but simply raised his voice to be heard over the motor and radio noise in the police car. (Id. at 89).  Plaintiff knew that more boisterous behavior "would be misinterpreted as threats or anything like that."  (Id.).  Plaintiff testified that he told Officer Logan "don't mess with me." (Id. at 105-106).   He explained this action as an attempt at "making an emphatic statement that I knew they were trying to escalate me into something and I wasn't going to participate in it." (Id. at 106).  Plaintiff was not attempting anything "combative."  (Id.).  Plaintiff also admitted to waiving his hand at Logan as he made this statement, but did not remember if he pointed at him.  (Id. at 106-107).

18

Eventually, plaintiff claimed, he received a citation for disorderly conduct.  (Id. at 110).  He signed the complaint and returned the officers their clipboard.  (Id.). The officers then informed him that he had to leave the scene or face arrest.  (Id.). At that point, Officer Logan had his handcuffs in his hands.  (Id.).  Fearful that his intentions would be mistaken, plaintiff held both hands in the air and told Logan and Davitt that he was reaching in his pants pocket for his keys.  (Id.).  After taking the keys out and placing them on the cab of his truck, plaintiff put his hands behind his back and rested his head on the tire of his truck.  (Id.).  One officer put his hand on plaintiff's back as Logan began to put the cuffs on plaintiff's wrist.  (Id. at 111). Plaintiff was unsure which officer did so.  (Id. at 112).  Logan removed the cuffs when Dean Spotso arrived.  (Id. at 111).  Plaintiff testified that no one forced his hands behind his back or his head to the tire.  (Id. at 112).  After a hearing, state Magistrate John P. Pesota reminded Officer Logan that "the offense of disorderly conduct is not intended as a castoff for every act which annoys or disturbs people and is not to be used as a dragnet for all irritations" faced by police officers. (Transcript of Hearing, Magisterial Court of the County of Lackawanna (Jan. 12, 2005), Attached as Exhibit 8 to Plaintiff's Answer to Defendants' Statement of Facts (Doc. 30) (hereinafter "T.") at 53).  The judge therefore found that reasonable doubt existed to convict the plaintiff and found him not guilty.  (Id. at 54).

Defendant Logan seeks summary judgment on plaintiff's false arrest claims. Courts have concluded that "[a]n arrest may violate the standards of the Fourth

19

Amendment if effected with unreasonable force, or if made without probable cause to believe that a crime has been committed." Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994). "Probable cause to arrest exists when the information within the arresting officer's knowledge at the time of the arrest is sufficient to warrant a reasonable law enforcement officer to believe that an offense has been or is being committed by the person to be arrested." Paff v. Kaltenbach, 204 F.3d 425, 436 (3d Cir. 2000). "The test for an arrest without probable cause is an objective one, based on 'the facts available to the officers at the moment of arrest.'" Barna, 42 F.3d at 819 (quoting Beck v. Ohio, 379 U.S. 89, 96 (1964)). Accordingly, "[a]s long as the officers had some reasonable basis to believe [the arrestee] had committed a crime, the arrest is justified as being based on probable cause." Id. Nevertheless, courts "have held that the question of probable cause in a section 1983 damage suit is one for the jury." Montgomery v. De Simone, 159 F.3d 120, 124 (3d Cir. 1998). Therefore, "summary judgment on [a] malicious prosecution claim therefore is only appropriate if taking all of [plaintiff's] allegations as true and resolving all inferences in her favor, a reasonable jury could not find a lack of probable cause for [plaintiff's] stop and arrest." Id.

The disagreement between the parties on this issue centers on the existence of probable cause to detain the plaintiff. Defendant contends that he had probable cause to cite the plaintiff for disorderly conduct. The facts available, however, create an issue of fact for the jury over whether the officers had probable cause to detain

the plaintiff.  The parties disagree about how the plaintiff behaved in the moments

before the officers placed him in handcuffs, about how loudly he raised his voice and

the reasons for the increased volume, and about whether his behavior was

sufficiently threatening to constitute grounds for police action.  We therefore find that

a question of fact exists for a jury to resolve over whether defendants had probable

cause to detain plaintiff.  We will deny summary judgment on these grounds.

A Section 1983 malicious prosecution action requires that: "(1) the defendants

initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's

favor; (3) the proceeding was initiated without probable cause; (4) the defendants

acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5)

the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as

a consequence of a legal proceeding." Dibella v. Borough of Beachwood, 407  F.3d

599, 601 (3d Cir. 2005) (quoting Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d

Cir. 2003)).  Courts have found that such a claim requires some sort of deprivation of

liberty beyond a mere summons to appear in court.  Id. at 603 (finding that plaintiffs

did not suffer a deprivation because they "were only issued a summons; they were

never arrested; they never posted bail; they were free to travel; and they did not

have to report to Pretrial Services.").   "[A] seizure is a show of authority that

restrains the liberty of a citizen."  Gallo v. City of Philadelphia, 161 F.3d 217, 223 (3d

Cir. 1998).  Such seizures may "be of different intensities.  Thus, whereas an arrest

that results in detention may be the most common type of seizure, an investigative

21

stop that detains a citizen only momentarily also is a seizure." Id.

As in the context of false arrest, the question in this matter is largely whether the defendant had probable cause to initiate the proceeding against plaintiff. Plaintiff's movement was restrained by the officers, who placed him in handcuffs. The defendants then initiated a proceeding which ended in the plaintiff's favor, and plaintiff was detained as part of that procedure.  Evidence also exists by which a reasonable juror could conclude that the arrest was initiated for reasons other than to serve the interests of justice.  Jurors could conclude that the conversation between the officer and Chief Stadniski during an otherwise routine traffic stop is evidence that the arrest was not predicated on the officers' good faith belief that plaintiff had committed an offense.  For the reasons discussed *supra*, the question of the existence of probable cause for the citation is also a question which should be resolved by a jury.

Defendant likewise seeks summary judgment on plaintiff's First Amendment retaliation claim.  To prevail on such a claim, a plaintiff must demonstrate "(1) that he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation." Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 282 (3d Cir. 2004).  Filing a complaint in a lawsuit is protected activity, since "an individual's constitutional right of access to the courts is protected by the First Amendment's clause granting the right to petition the government for grievances." Anderson v. Davila, 125 F.3d 148, 161 (3d Cir. 1997).

22

This right applies equally to all civil lawsuits.  See Bardley v. Pittsburgh Bd. of Education, 910 F.2d 1172, 1177 (3d Cir. 1990) (holding that "[a]n action that would otherwise be permissible is unconstitutional if it is taken in retaliation for the exercise of the right of access to the courts.  Although most cases concerning retaliation in violation of the right of access to the court have arisen in the prison context, the same principles have been applied in other areas."); San Filippo v. Bongiovanni, 30 F.3d 424,443 (3d Cir. 1994) (finding that "[t]he mere act of filing a non-sham petition is not a constitutionally permissible ground for discharge of a public employee.").

        We will deny the motion on this point as well.  Before the officers cited the plaintiff, he had filed a lawsuit against the department seeking compensation for benefits which he contended were inappropriately denied.  Such a court filing constitutes activity protected by the First Amendment.  See, e.g., Bradley, 910 F.2d at 1177.  Evidence exists by which reasonable jurors could conclude defendants had been aware of plaintiff's complaints about the department and his attempt to seek compensation through the courts.  A reasonable juror could conclude that plaintiff's lawsuit created hostility towards him by the defendants which led them to issue a citation that ultimately proved baseless, if embarrassing to him.

        Defendant Logan also seeks summary judgment on plaintiff's state law assault and battery and false arrest claims.  Under Pennsylvania law, "'[a]ssault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in the assault is actually done, though in

23

ever so small a degree, upon the person.'" Renk v. City of Philadelphia, 641 A.2d 289, 293 (Pa. 1994) (quoting Cohen v. Lit Brothers, 70 A.2d 419, 421 (Pa. Super. Ct. 1950)).  A party bringing a claim of assault and battery against a police officer, however, must overcome the state law principle that "[a] police officer may use reasonable force to prevent interference with the exercise of his authority or the performance of his duty."  Id.  Accordingly, "[i]n making a lawful arrest, a police officer may use such force as is necessary under the circumstances to effectuate the arrest.  The reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery."  Id.  In Pennsylvania, a false arrest is "1) an arrest made without probable cause or 2) an arrest made by a person without privilege to do so."  McGriff v. Vidovich, 699 A.2d 797, 799 n.3 (Pa. Commw. Ct. 1997).  Because we find that there is a question of fact as to whether defendants had probable cause to arrest plaintiff and thus whether his arrest was lawful, we find that there is a question of fact as to whether defendants are liable for assault and battery and false arrest under Pennsylvania law.  We will therefore deny summary judgment on those claims.

Defendant Logan argues that the facts in evidence here establish that Officer Logan is entitled to qualified immunity.  Qualified immunity for police officers "absolves defendants if reasonable officers could have believed their conduct was lawful 'in light of clearly established law and the information the searching officers possessed.'"  Karnes v. Skrutski, 62 F.3d 485, 491 (3d Cir. 1995) (quoting Anderson

v. Creighton, 483 U.S. 635, 641 (1987)).  Determining whether qualified immunity applies is a two "step process:" "[f]irst, we must determine whether the defendants violated 'clearly established' rights . . . [s]econd, we determine whether a reasonable officer would have believed that his or her conduct deprived plaintiff of his or her constitutional rights."  Harvey v. Plains Twp. Police Dept., 421 F.3d 185, 192 (3d Cir. 2005).

We find that qualified immunity does not apply to Officer Logan in this case. The events that led to plaintiff's detention and citation in the case are in dispute, with plaintiff arguing that he did nothing to provide defendant with probable cause to arrest him and Officer Logan claiming that plaintiff's behavior caused him to feel a legitimate threat to his safety.  Plaintiff's explanation of his actions, combined with phone calls between the officers at the scene and the Chief of Police, however, could lead a reasonable juror to conclude that Officer Logan cited plaintiff not because of his action but because of a decision of members of the Police Department to retaliate against plaintiff for filing complaints against the Borough.  If jurors interpret the facts on the case in that way, they could conclude that Logan violated plaintiff's clearly established constitutional right to be free of unlawful arrest. We will therefore deny defendants' motion for summary judgment as it relates to Defendant Logan, except for plaintiff's claim of intentional infliction of emotional distress.

**iii.  Officer Davitt**

Officer Davitt testified that when he first noticed plaintiff at the scene he walked up to his police car and shouted at Officer Logan "who is in charge of this clusterfuck?"  (Deposition of Officer Phillip Davitt, attached as Exhibit 5 to Plaintiff's Answer to Defendants' statement of facts (Doc. 30) (hereinafter "Davitt Dep.") at 34). Davitt found this behavior "unreasonable," though he was not certain he understood it to be threatening.  (Id. at 35).  He also observed plaintiff pointing his finger at Officer Logan, though he could not hear what plaintiff said.  (Id. at 36-37).  Soon thereafter, Davitt observed Officer Logan writing out a citation to the plaintiff.  (Id. at 50).  Officer Davitt felt that plaintiff "was acting like a fool, you know, putting his hands behind his back like he wanted us to handcuff him."  (Id.).   Davitt did not take out his handcuffs on this occasion, and he did not recall seeing Officer Logan do so. (Id. at 59).  He also testified that he did not place his hand on plaintiff, nor did he see Logan do so.  (Id.).  Plaintiff testified that after he returned the citation to Officer Logan, he noticed that Logan had cuffs in his hands.  (Nudelman Dep. at 110). Complying with directions from the officers, he put his hands behind his back and his head on the tire of his truck.  (Id.).  When he did so, "a hand came on my back to hold me there, and the other guy put the cuff" on him.  (Id. at 110-11).  Plaintiff then identified Logan as the person who put the cuff on him.  (Id.  at 111).

Officer Davitt contends that he was not involved in any of the activities that led to plaintiff's arrest, and that he should therefore be granted summary judgment on all counts.  An issue of fact exists, however, about the role that Davitt played in the

arrest.  Plaintiff testified that Officer Davitt assisted in his arrest, and may have placed his hand on plaintiff's back.  If a jury believes his testimony of the role that Davitt played, the jury could find Defendant Davitt liable for unlawful arrest, malicious prosecution, retaliation and the state law claims in the case.  For the same reasons that we find that an issue of fact exists on these claims in relation to Officer Logan, we also find that summary judgment would be unwarranted on these claims against Officer Davitt.  For the same reasons described above in relation to Officer Logan, we also find that qualified immunity does not apply to Officer Davitt.  We will therefore deny defendants' motion on this point.

### iv.  Chief Stadniski

Defendants contend that Chief Standnitski should be granted summary judgment on any claims arising from his alleged failure adequately and properly to train his subordinates to avoid violating plaintiff's constitutional rights in arresting him.  They argue that plaintiff has not produced evidence to demonstrate that Chief Stadniski should be subject to supervisory liability for these claims.  No evidence exists, defendants insist, to show that Stadniski knew of a prior pattern by his subordinates of improper behavior and that he communicated his approval of such behavior to those subordinates.

Though *respondeat superior* liability is unavailable under Section 1983, supervisory liability can exist.  To establish such liability "[t]he plaintiff must (1) identify the specific supervisory practice or procedure that the supervisor failed to

27

employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure." Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001).  A plaintiff cannot, however, simply allege that his injury would not have occurred if the supervisor had adopted a certain policy: instead, "the plaintiff must identify specific acts or omissions of the supervisor that evidence deliberate indifference and persuade the court that there is a 'relationship between the 'identified deficiency' and the 'ultimate injury.'" Id.  (quoting Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989)).  Further, "a failure to train, discipline or control can form the basis for section 1983 municipal liability if the plaintiff can show both contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." Montgomery v. De Simone 159 F.3d 120, 127 (3d Cir. 1998).

We find that evidence exists by which a reasonable juror could conclude that plaintiff's injury resulted from the Chief's failure to supervise police officers properly. For similar reasons to those which led us to conclude that the defendant Borough should be liable for its policies, we find that Chief Stadniski should not be granted

summary judgment based on a lack of supervisory liability.  A reasonable juror could

conclude that plaintiff's citation was the result of the Chief's unwillingness to train

officers in avoiding unnecessary citations against the Borough's political opponents.

Since the Chief was aware of disputes and complaints about improper procedures, a

reasonable juror could find that his failure to provide specific training in this area was

deliberate indifference that injured the plaintiff.   In any case, we take plaintiff's

argument to be at least in part that Defendant Stadniski participated in the decision

to issue him a citation, the action which he claims caused his injury.  In that case, the

Chief could be liable not merely as a supervisor, but as a participant in the event that

caused the injury.  We will accordingly deny the motion for summary judgment on

those grounds.

       Defendants also argue that the false arrest, malicious prosecution and

retaliation claims against the Chief should also be dismissed.  They claim that no

evidence exists to prove that Stadniski ordered, directed or encouraged Officer

Logan to cite the plaintiff.  We disagree.  A juror could conclude that telephone

conversations between the Chief and the officers on the scene, given their close

proximity to plaintiff's citation, are evidence that the officers acted after direction from

Defendant Stadniski.  We note that the officers and the Chief deny that they agreed

to cite plaintiff, but find that the truth of such denials is a credibility determination that

should be left to a jury.   Because the evidence also demonstrates that plaintiff had

filed other claims against the department before the decision to cite him, a

reasonable juror could also conclude that the defendants' actions in this case were an attempt at retaliation.  For the same reasons that we conclude that Officers Logan and Davitt should not be entitled to qualified immunity in this case, we also find that Chief Stadniski is not entitled to such legal protection.  Accordingly, except for plaintiff's intentional infliction of emotional distress claim, we will deny defendants' motion for summary judgment in relation to Chief Stadniski.

**Conclusion**

For the foregoing reasons we will grant the defendants' motions in part and deny them in part.  An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HAROLD NUDLEMAN,** | : | **No. 3:05cv1362** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **BOROUGH OF DICKSON CITY** | : | |
| **POLICE DEPARTMENT,** | : | |
| **WILLIAM A. STADNISKI, PHILIP F.** | : | |
| **DAVITT, and THOMAS** | : | |
| **LOGAN,** | : | |
| **Defendants** | : | |

## ORDER

_____**AND NOW**, to wit, this 6th day of November 2007, the defendants' motions for summary judgment (Doc. 25) are **GRANTED** in part and **DENIED** in part, as follows:

1) Defendants' motions for summary judgment are **GRANTED** with respect to plaintiff's claim of intentional infliction of emotional distress;

2) Defendants' motions for summary judgment are **GRANTED** with respect to plaintiffs conspiracy claim under 42 U.S.C. § 1985(3); and

3) Defendants' motions for summary judgment are **DENIED** in all other respects.

BY THE COURT:

s/ James M. Munley
**JUDGE JAMES M. MUNLEY**
**United States District Court**